# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | 8:06CV568 |
| $64,640.00 IN UNITED STATES ) | |
| CURRENCY, ) | MEMORANDUM AND |
| ) | ORDER |
| Defendant, ) | |
| ) | |
| LAWRENCE MCINTOSH, ) | |
| ) | |
| Claimant. ) | |

This is an action pursuant to 18 U.S.C. § 881 for the forfeiture of $64,640 in United States Currency seized at Eppley Airfield near Omaha, Nebraska, on January 20, 2006. Pursuant to 28 U.S.C. § 636 and the consent of the parties, the matter was tried to the court on March 20, 2007. The final post-trial submission was filed on May 4, 2007, at which time the case was deemed submitted for decision. As discussed below, I find that judgment should be entered in favor of the plaintiff.

## I. JURISDICTION

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355 and 1395, and pursuant to 18 U.S.C. § 881. Venue in this district is proper under 28 U.S.C. § 1391.

## II. EVIDENTIARY RULINGS

Defendant offered the following exhibits as "learned treatises" to support his contention that contamination of currency by marijuana and cocaine is widespread throughout the United States:

Exhibit 101:   Jonathan Oyler, William D. Darwin, and Edward J. Cone, *Cocaine Contamination of United States Paper Currency*, Journal of Analytical Toxicology, Vol. 20, July/August 1996.

> Exhibit 102: Eric S. Lavins, Bethany D. Lavins, and Amanda J. Jenkins, *Cannabis (Marijuana) Contamination of United States and Foreign Paper Currency*, Journal of Analytical Toxicology, Vol. 28, September 2004.

The government objected to the exhibits on the ground they do not fall within the "learned treatises" exception to the hearsay rule. In this regard, Rule 803 of the Federal Rules of Evidence provides:

> The following are not excluded by the hearsay rule even though the declarant is available as a witness:
>
> * * * *
>
> (18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Eighth Circuit precedent strongly suggests that Exhibits 101 and 102 are not admissible. For example, in *United States v. Turner*, 104 F.3d 217 (8th Cir. 1997), the trial court refused to take judicial notice of several medical texts the defendant offered in an attempt to impeach a testifying informant who suffered from a seizure disorder. The court also refused to permit defense counsel to read to the jury from the medical texts. Applying Fed. R. Civ. P. 803(18), the Court of Appeals held that the materials were inadmissible:

> In the present case, there was no expert testimony establishing the texts as authoritative. Federal Rule of Evidence 803(18) provides that the portions of the text may be read only to the extent that it is called to the attention of an expert witness or relied upon by the expert witness in direct examination. Thus, the district court correctly ruled that the medical texts could not be admitted pursuant to Federal Rule of Evidence 803(18).

*Turner*, 104 F.3d at 221.  *Accord Hill v. Hill*, 10 Neb. App. 570, 576, 634 N.W.2d 811 , 816 (Neb. Ct. App. 2001).

There was no expert testimony presented in this case.  I find that Exhibits 101 and 102 are not admissible.  Accordingly, the government's oral motion in limine (2:18-3:3) is granted, and the court will not consider Exhibits 101 and 102 as evidence.

### III.  TESTIMONY

Two officers of the Nebraska State Patrol (NSP) testified on behalf of the United States.  The claimant did not call any witnesses.

NSP Investigator Jason Scott testified that he has been employed by the NSP since 1998 and assigned to the commercial interdiction unit for over three years.  Scott received special training in this field.  He is typically stationed at bus stations, airports, and shipping companies in an effort to disrupt the flow of narcotics through the state of Nebraska via commercial transport.  Scott is also a canine officer.

During his training, and through personal experience, Scott learned that there are many attributes separating "drug currency" from "normal" currency, i.e., "its packaging, the amounts that it's put into, paperwork to go with it, a justified story to go with it, possession of it, and claimed possession."  For example, drug money is often rubber-banded in "drug quantities."  Scott explained that drugs are sold for twenties, fifties and hundreds, not fives and tens.  Drug currency will be packaged in such denominations, and often broken into $1,000 dollar amounts that are then bundled into $10,000 amounts and then into stacks of those $10,000 amounts.  Sometimes the currency is vacuum-sealed with dryer sheets to throw off a drug detection dog or to cover the odor of the money.

Drug currency is often kept away from any legitimate money. Approximately once a week, Scott encounters currency he believes to be involved in drug transactions.

Investigator Scott has also received instruction on the identification and recognition of controlled substances, specifically, marijuana. He has been exposed to marijuana on numerous occasions in the thousands of investigations he has conducted over the past four years.

Scott was assigned a canine when he was assigned to the commercial interdiction unit. His dog is a male beagle named Apollo. Scott initially completed a six-week training course with Apollo through the NSP. Scott and Apollo passed the certification process and have been recertified annually by the NSP. Scott and Apollo continue to conduct weekly training together. Apollo has been tested almost 400 times and has been approximately 90% accurate in his indications.

On January 30, 2006, at 11:30 a.m., Scott received a phone call from Sergeant Gary Shillito of the Omaha Airport Authority. The Airport Authority wanted the commercial interdiction unit to assist in an investigation involving a large amount of currency found in abandoned luggage. The two bags in question were a blue roll-away bag and a black duffel bag. The black duffel bag had a baggage tag from US Airways, bearing the name Lawrence McIntosh. Both bags were checked to be placed on an 11:30 a.m. flight to Phoenix.

Scott arrived at Eppley Airfield shortly before noon. He contacted the Transportation Authority (TSA) and Sergeant Shillito, who showed him the bags or luggage in question and told Scott how they discovered the money. Scott instructed them to close the bags back up. He then deployed Apollo on the bags. Scott subsequently obtained a search warrant and executed the warrant on the bags. He was at the airport for about one hour that day.

Photographs of the luggage (Exhibits 3-7) depict the defendant currency as it was originally found–in thick rubber-banded stacks stored in the pockets of various articles of clothing. Apollo gave a positive indication to the odor of narcotics on the luggage. Investigating officers later separated the money from the bags. Scott attempted to perform a discretionary search of the currency itself with Apollo, but the dog "had a foul reaction to the money." Scott testified that he had seen Apollo react that way on only one other occasion, when the money to be examined was tainted with strychnine poison.

When counting the money at the police station, Scott personally observed that the money smelled like raw marijuana; however, he did not remember particularly the bag smelling like marijuana.

Scott did not know the whereabouts of the claimant, Lawrence McIntosh, when the bags were seized. Officers interviewed a taxicab driver who told them where he believed he left Lawrence McIntosh; the officers determined that McIntosh did not get on the plane to Phoenix that day. Nor did McIntosh attempt to contact Scott personally after Scott took possession of the bags.

On cross-examination, Scott acknowledged that the money was not vacuum-sealed; however, it was bundled in quantities consistent with drug trafficking, i.e., in "twenties, fifties and hundreds that drugs are typically sold in." Thus, Scott suspected the money was involved in drug activity even though no drugs, drug paraphernalia, customer lists, bags or packaging materials were found in McIntosh's luggage.

Nebraska State Patrol Investigator Richard Lutter testified that he has been a member of the commercial interdiction unit since July 1994. He worked with Investigator Scott at Eppley Airfield on January 30, 2006. Lutter did not actually board the 11:30 flight to Phoenix, but did speak to

people going onto the flight on the Jetway leading from the building to the plane. Lutter was unable to locate Mr. McIntosh on the Jetway or on the flight.

After the two bags were seized, Lutter dialed the telephone number given on the luggage tag. An unidentified male party answered the line, and Lutter asked for Lawrence McIntosh. Based on the party's response, Lutter advised that he was trying to contact McIntosh regarding his luggage and asked the party if he could get in contact with McIntosh to have McIntosh call Lutter at Lutter's personal cell phone number. Lutter did not ever receive a phone call from an individual representing himself to be Lawrence McIntosh.

## IV. CONCLUSIONS OF LAW

### A. Standing

The government contends that Lawrence McIntosh abandoned his luggage at Eppley Airfield and, therefore, lacks standing to assert a claim against the subject currency.

*In rem* forfeiture actions arising from a federal statute are governed by the Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions. Supplemental Rule G, which took effect December 1, 2006, states that "[a]t *any time before trial*, the government may move to strike a claim or answer ... because the claimant lacks standing ." Fed. R. Civ. P. Supp. Rule G(8)(c)(i)(B) (emphasis added).[1] Here, the government did not move to strike McIntosh's claim

---

[1]Supplemental Rule G(8)(c) provides:

(8) Motions
   * * * *
   (c) Motion to Strike a Claim or Answer.
      (i) At any time before trial, the government may move to strike a claim or answer:
         (A) for failing to comply with Rule G(5) or (6), or
         (B) because the claimant lacks standing.
      (ii) The motion:
         (A) must be decided before any motion by the claimant to dismiss the action; and

or answer "at any time before trial," presumably because Supplemental Rule G came into effect over two months after the claimant's answer was filed in this matter.

The Advisory Committee Notes advise that Supplemental Rule G "generally applies to actions governed by the Civil Asset Forfeiture Reform Act of 2000 (CAFRA[2])." The Advisory Committee Notes further advise that subdivision (8) addresses a number of issues that are unique to civil forfeiture actions. Specifically,

> Paragraph (c) governs the procedure for determining whether a claimant has standing. It does not address the principles that govern claim standing.
>
> * * * *
>
> Paragraph (c)(ii) directs that a motion to strike a claim or answer be decided before any motion by the claimant to dismiss the action. **A claimant who lacks standing is not entitled to challenge the forfeiture on the merits.**
>
> Paragraph (c)(ii) further identifies three procedures for addressing claim standing. If a claim fails on its face to show facts that support claim standing, the claim can be dismissed by judgment on the pleadings. If the claim shows facts that would support claim standing, those facts can be tested by a motion for summary judgment. If material facts are disputed, precluding a grant of summary judgment, the court may hold an evidentiary hearing. The evidentiary hearing is held by the court without a jury. **The claimant has the burden to establish claim standing at a hearing; procedure on a government summary judgment motion reflects this allocation of the burden.**

(Emphasis added). *See, e.g., United States v. $148,840.00 in United States Currency*, Case No. 05-1263, — F. Supp. 2d — , 2007 WL 1229431 at *1 n.1 (D.N.M., March 30, 2007) (granting United States' Motion to Dismiss/Strike Claim and Answer for Lack of Article III Standing or Motion for Summary Judgment).

---

(B) may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence.

[2]843 Pub. L. No. 106-185, 114 Stat. 202 (2000), encoded in part at 18 U.S.C. § 983.

> Whether a claimant has Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The question is whether the claimant has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr*, 369 U.S. 186, 204 (1962); *see also Sierra Club v. Morton*, 405 U.S. 727, 731 (1972) (a litigant must possess "a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy"). In a forfeiture case, a claimant's Article III standing "turns on whether the claimant has a sufficient ownership interest in the property to create a case or controversy." *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003); *see also United States v. One 18th Century Colombian Monstrance*, 797 F.2d 1370, 1374-75 (5th Cir. 1986) (a claimant must show at least a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement). An ownership interest "may be evidenced in a number of ways including showings of actual possession, control, title and financial stake." *One Lincoln Navigator 1998*, 328 F.3d at 1013 (quoting *United States v. One 1945 Douglas C-54 (DC-4) Aircraft*, 647 F.2d 864, 866 (8th Cir. 1981)).

*United States v. $148,840.00*, 2007 WL 1229431 at *2.

McIntosh's claim of ownership was sufficient, at the pleading stage, to establish standing to contest forfeiture of the defendant currency. Since the issue of Article III standing was not raised prior to trial, and the parties proceeded to a trial on the merits, I will assume without deciding that Lawrence McIntosh has Article III standing and will consider this lawsuit on the merits.

**B. Forfeiture**

The civil forfeiture statute, 21 U.S.C. § 881(a)(6), authorizes the forfeiture to the United States of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

-8-

CAFRA, 18 U.S.C. § 983, governs the burden of proof in this matter:

(c) In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property–

(1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture; [and]
* * * *
(3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

"Thus, the United States bears the initial burden of establishing by a preponderance of the evidence that the property is substantially connected to drug trafficking.... Circumstantial evidence can be used by the United States to establish its burden of proof." *United States v. $84,615 in United States Currency*, 379 F.3d 496, 501 (8th Cir. 2004) (citing *United States v. $10,700 in United States Currency,* 258 F.3d 215, 224 n.6 (3d Cir. 2001)). *See also United States v. $117,920 in United States Currency*, 413 F.3d 826, 829 (8th Cir. 2005). "In a forfeiture trial the government does not have to show evidence of, or trace the money to, a particular narcotics transaction." *United States v. $150,660 in United States Currency*, 980 F.2d 1200, 1205 (8th Cir. 1992); *see also United States v. $10,700 in United States Currency*, 258 F.3d 215, 225 (3d Cir. 2001). The Eighth Circuit has also recognized that possession of a large amount of cash is strong evidence that the cash is connected with drug activity. *United States v. $84,615*, 379 F.3d at 501-502; *United States v. $117,920*, 413 F.3d at 829; *United States v. $124,700 in United States Currency*, 458 F.3d 822 (8th Cir. 2006).

In this case, the government has shown that large bundles of cash were found in luggage checked in the name of Lawrence McIntosh to be placed on an 11:30 a.m. flight to Phoenix. There was uncontroverted testimony that Mr. McIntosh did not board that flight; instead, he took a taxi

away from Eppley Airfield. The bags were detained by airport authorities. The drug detection dog, Apollo, alerted to the scent of narcotics when presented with the closed pieces of luggage. The dog "had a foul reaction to the money" after it was removed from the bags, suggesting to Investigator Scott that the money was contaminated with poison. Scott himself observed that the bundles of currency smelled like raw marijuana, although he did not recall the unopened bags smelling of marijuana. The currency found in the bags was bundled in quantities consistent with the denominations commonly used in drug trafficking, i.e., in "twenties, fifties and hundreds." The currency was seized pursuant to a search warrant.

Mr. McIntosh has argued, and the court agrees, that it was not illegal for him to possess or travel with over $64,000 in currency. Nor was it illegal for him to leave the airport before his flight left, leaving his checked luggage to be transported to Phoenix. Mr. McIntosh chose not to testify and did not present any admissible evidence in this case, which is his right; however, he must bear the consequences of that decision.

For example, in *United States v. $148,840*, the claimant asserted that he was the owner of the defendant currency but, during discovery, he repeatedly invoked his Fifth Amendment privilege against self-incrimination in response to any questions regarding his ownership of the currency, the source of the currency, the packaging of the currency, how the currency got into the cooler where it was found, and whether the currency represented the proceeds of illegal drug trafficking. He also invoked his Fifth Amendment right in response to questions about his sources of income, his employment history, where he had previously lived, and his travel itinerary. On summary judgment, the court found that the claimant had not proven he had an ownership interest in the $148,840:

> The requirement that a claimant provide some evidence in support of his claim of ownership at the summary judgment stage is not altered by the assertion of a claimant's Fifth Amendment rights. *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 83 (2d Cir. 1995) ("[T]he claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation."). It is a claimant's right to invoke his Fifth Amendment privilege, however, a "party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence." *United States v. Taylor*, 975 F.2d 402, 404 (7th Cir .1992). As the Supreme Court has explained,
>> while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness ... declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production. We think the view of the Court of Appeals would convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his. None of our cases support this view.
> *United States v. Rylander*, 460 U.S. 752, 758 (1983).

*United States v. $148,840*, 2007 WL 1229431 at *4. Because the claimant had not presented any evidence that he was the owner of the currency, the court found he lacked Article III standing to challenge its forfeiture. *Id*.

The court can only draw inferences based on the record that was presented and, in this case, Mr. McIntosh must also "bear the consequence of lack of evidence." The Eighth Circuit Court has observed that possession of a large sum of cash is strong evidence of a connection to drug activity; $64,640 is a large sum of cash. In *United States v. $124,700*, the court observed that "while an innocent traveler might theoretically carry more than $100,000 in cash across country and seek to conceal funds from would-be thieves on the highway, we have adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking." 458 F.3d at 826. A canine alert also supports the connection. *Id.*

In this case, the drug dog, Apollo, alerted to the bags where the currency was stored. The dog has a record of reliability. A search warrant was issued for the bags. The investigating officer personally observed that the money smelled like raw marijuana. For reasons unexplained, Mr. McIntosh did not board the plane to Phoenix but instead departed in a taxi after he left over $64,000 in cash in his checked luggage. This conduct supports the inference that McIntosh was attempting to distance himself from the bags and the money. Based on these circumstances, and in light of the Eighth Circuit's decision in *United States v. $124,700 in United States Currency*, 458 F.3d 822 (8th Cir. 2006), I find that the United States has shown, by a preponderance of the evidence, the defendant property is substantially connected to drug trafficking.

Since the United States has met its burden in establishing a substantial connection between the $64,640 and drug trafficking, the burden shifts to the claimant to refute the government's case by proving that he is an "innocent owner" of the property. *See United States v. 392 Lexington Parkway S.*, 386 F. Supp. 2d 1062, 1066-67 (D. Minn. 2005). In this regard, 18 U.S.C. 983(d)(1) provides, "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." The Claimant bears the burden of proving by a preponderance that he is an innocent owner. *Id*. The term "owner" does not include "a nominee who exercises no dominion or control over the property." § 983(d)(6)(B)(iii).

The statute requires the claimant to prove, (1) he had an ownership interest in the property, and (2) he did not know of the conduct giving rise to forfeiture, or, upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property. § 983(d)(2)(A)(i) & (ii).

In this instance, the claimant did not present any evidence that he owns the subject currency. The circumstances of his possession of the money remain completely unexplained. Consequently, I find that the claimant, Lawrence McIntosh has not shown by a preponderance of the evidence that he was an innocent owner of the subject currency.

## V.  DECISION

The United States has shown, by a preponderance of the evidence, that the defendant property is substantially connected to drug trafficking. The claimant has not met his burden of proving that he is an innocent owner, or even an owner, of the currency. Thus, the court finds that the defendant currency should be forfeited to the United States and judgment should be entered in favor of the plaintiff and against the claimant, Lawrence McIntosh.

A separate judgment will be entered contemporaneously with this Memorandum and Order.

**IT IS SO ORDERED.**

**DATED May 30, 2007.**

> BY THE COURT:
>
> s/ F.A. Gossett
> **United States Magistrate Judge**